406 So.2d 1103 (1981)
Richard Cecil BLAIR, Appellant,
v.
The STATE of Florida, Appellee.
No. 58072.
Supreme Court of Florida.
November 25, 1981.
*1104 Gary Smigiel of Gehris, Smigiel & Associates, P.A., Daytona Beach, for appellant.
Jim Smith, Atty. Gen., and Richard W. Prospect, Asst. Atty. Gen., Daytona Beach, for appellee.
ADKINS, Justice.
This is a direct appeal from a judgment adjudging defendant guilty of murder in the first degree and a sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
The defendant was charged with the premeditated murder of his wife, Kim Blair, whom he met while serving with the armed forces in Viet Nam. Kim was the mother of three children, Betty, Bobby, and Becky. The family lived together in Daytona Beach, Florida, until defendant accepted employment in Africa. Upon defendant's return from Africa, domestic difficulties arose which resulted in the death of Kim Blair.
*1105 Under the state's theory, arguments arose because of Kim's complaint that defendant and her daughter, Betty, were spending too much time together and Kim was going to the police about it. The state says that defendant decided to murder his wife, purchased a weapon and ammunition, utilized a conveniently stopped-up sink to justify the digging of what turned out to be the burial site, arranged for the two daughters to be gone at the time the actual shooting took place, made sure all the children were gone while the murder scene was cleaned up and evidence destroyed, and then in the middle of the night, buried the remains of his wife.
The defendant says he had an argument with his wife, she left the home, and when she returned found a gun and ammunition in defendant's car. Defendant says Kim loaded the gun, came into the house, walked into the bedroom and yelled at defendant. At this time, she fired a shot at him which hit a screen and went through the window, breaking the window behind the screen. There was a struggle over the gun and during the course of the struggle the gun went off and Kim Blair was struck in the head. Two more shots were fired. At this point, the defendant went into a state of panic, dug a hole in the backyard, dragged his wife out, and put her in the hole. Then he went back in the house to finish cleaning up the bedroom and found a gun that Kim Blair had hidden under the mattress.
The jury found defendant guilty of murder in the first degree. The case then proceeded into the penalty phase of the bifurcated trial and the jury recommended to the court that it impose the death penalty. The trial court followed the recommendation of the jury and imposed a death sentence. A motion for new trial was denied and this appeal resulted.
On July 14, the night of the homicide, defendant told Bobby that Kim had left home and that she was going to Miami to visit friends and get some rest. On July 15, the defendant told Mrs. Thomas King, a friend of Kim's, that Kim had gone to his mother's house. On July 16 the defendant told Suzie Shepherd, another friend of Kim's, that his wife had felt bad and had gone to defendant's mother's house to stay. On July 18, after a second inquiry by Suzie, the defendant told her that his wife had left home on July 14 with a woman in a blue car. On the morning after the disappearance, defendant told Becky, the daughter of Kim, that Kim was ill and he had to take her to the hospital. Defendant's stories to the investigating officers relating to the disappearance of his wife were just as inconsistent. The law enforcement officers then began an investigation. A search warrant was issued and upon a search of the premises the body of Kim was discovered.
The defendant attacks the legality of the search contending that the affidavit supporting the search warrant did not establish probable cause for the search; the facts in the affidavit were based upon double hearsay and upon the testimony of unreliable witnesses; and the affidavit contained misrepresentations of fact. In State v. Wolff, 310 So.2d 729 (Fla. 1975), we said:
Before issuing a search warrant, an issuing magistrate must make three distinct determinations. He must evaluate (1) the truthfulness and integrity of the witness before him; (2) the reliability of the source of the hearsay information, if any; and (3) the adequacy of the factual premises furnished from all sources to support the validity of the conclusion. In the first instance, he is judging the honesty, integrity, and truthfulness of the person before him. In the second instance, he is judging from the facts of prior actions the reliability and trustworthiness of a non-swearing informant. In the third instance, he is judging the reason and logic of the proposition to reach its ultimate conclusion. These are each distinct functions. They include the so-called two-pronged test contained in Aguilar v. Texas, [378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723] supra, as explained in Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Clearly, an affidavit for a search warrant of a dwelling may be constitutionally *1106 based on hearsay information and need not reflect the direct personal observations of the affiant. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).
Id. at 732-33.
The bulk of the information forming the basis of the affidavit came from defendant Blair himself. Inconsistent stories alone were sufficient to raise some cause for suspicion. In addition the defendant admitted that he had forged letters and checks so that he could secure funds belonging to Kim Blair. In other words the disappearance of Kim Blair was not as "normal" as one might think. There was information concerning the digging of a hole in the backyard and the pouring of cement over it. There were statements from the victim's daughters to the effect that during the night after Kim's disappearance they both saw, independent of each other, defendant carry into the yard what appeared to be their mother's body wrapped up in a sheet.
One statement in the affidavit was admittedly incorrect, but after deletion of these erroneous facts, the affidavit still contains sufficient facts to demonstrate probable cause. These incorrect statements do not invalidate the search warrant. Stipp v. State, 355 So.2d 1217 (Fla. 4th DCA), cert. denied, 364 So.2d 893 (Fla. 1978). From an examination of the record it appears that the magistrate who issued the warrant was presented with sufficient facts to properly and legally reach the conclusion that there was probable cause to believe that Kim Blair was dead and that her body was beneath a cement slab in the backyard of her house.
During direct examination defendant testified that on the day of the homicide he and his wife had argued. This argument centered around the way "things was going in the house." Kim was not satisfied with the amount of money she had in her possession and the amount of time that defendant spent "not only with Betty, but Bobby." The record then discloses the following on direct examination:
Q Didn't a day or two of that, there had been an argument, there had been an argument where she said you were spending too much time with Betty?
A Yes, sir.
Q Okay. I am sorry. I was confused. And did she mention the word "police" in that context?
A Not that I recall, sir.
Q Did she threaten to take Betty to the police and put her in a home?
A Yes, sir.
Q Was that during the argument?
A She made several threats to it, yes, sir.
The following transpired on re-cross-examination:
Q Did the threat that was made that you are speaking of have anything to do with the fact that Kim believed that Betty was pregnant?
A Not that I recall, sir.
Q Not that you recall. Is it possible?
A No, sir.
The defense then moved for a mistrial because of the insinuation that defendant got his stepdaughter pregnant. The court ruled that "the door was open" on direct examination and denied the motion for mistrial. Defendant has failed to show reversible error in this ruling.
The defendant filed a motion seeking permission to photograph daily court proceedings on the ground that such photographs would permit him to preserve "nonverbal legal errors". Defendant has failed to show a right to take such photographs and has failed to show that the trial judge abused his discretion in denying the motion.
Defendant contends that the trial court committed reversible error by allowing numerous statements made by the defendant into evidence when such statements were made after the death of the deceased and were inconsistent. The defendant says that this was an attack on defendant's character before the defendant took the stand. The statements were obtained either in non-custodial situations or after a proper rights advisement. They *1107 were voluntarily offered and all represented admissions or declarations which sought to provide a story or explanation of Kim's disappearance. The fact that the statements were inconsistent shows not only guilty knowledge but also the very real intent to cover up the fact that Kim Blair was dead and that her death was the result of his criminal agency. Such matters may be shown by acts, conduct, and declarations before, at the time of, or after the commission of a criminal act. Jones v. State, 44 Fla. 74, 32 So. 793 (1902). The statements were admissible.
Defendant also argues that the prosecutor, in his closing argument, improperly "continued to use his own comments to influence the jury", and made other statements not supported by the record. We have reviewed the transcript, and are of the opinion that there was a basis in the record for the allegedly unsupported statements.
As for the other comments complained of, we cannot say that they were "of such a nature so as to poison the minds of the jurors or to prejudice them so that a fair and impartial verdict could not be rendered." Oliva v. State, 346 So.2d 1066, 1068-69 (Fla. 3d DCA 1977), cert. denied, 434 U.S. 1010, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978). They did not "materially contribute to this conviction", Zamot v. State, 375 So.2d 881, 883 (Fla. 3d DCA 1979) were not "so harmful or fundamentally tainted so as to require a new trial", Smith v. State, 354 So.2d 477, 478 (Fla. 3d DCA 1978); and were not so inflammatory that they "might have influenced the jury to reach a more severe verdict of guilt than it would have otherwise ...", Darden v. State, 329 So.2d 287, 289 (Fla. 1976), cert. dismissed, 430 U.S. 704, 97 S.Ct. 1671, 51 L.Ed.2d 751 (1977). As we noted in Paramore v. State, 229 So.2d 855, 860 (Fla. 1969), modified, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972), "it will not be presumed that ... [jurors] are led astray, to wrongful verdicts, by the impassioned eloquence and illogical pathos of counsel." The statements here complained of do not warrant a new trial for defendant.
Defendant also questions the sufficiency of the evidence to show premeditation. This case involved an example of resolution of fact. The state presented evidence of a circumstantial nature which gave the jury a confident basis to conclude that in light of Kim's threat to defendant he planned her murder. Suzie Shepherd last saw Kim on July 14 when she brought food to her and, at that time, described her as being very sick and unable to eat. Prior thereto, defendant had Bobby dig a hole in the measurements described in the record. After the hole was dug, a piece of plywood was place over it. Bobby was then unexpectedly called home to mow the grass. He did not see his mother. Defendant then got rid of Betty and Becky by sending them on an errand to the store. He told Bobby that when the girls returned they were all to go to the Dairy Queen and to be sure and stay out for at least an hour. He told Bobby that when they returned, his mother would no longer be there since she was going to Miami. Bobby was not to tell Becky. Defendant told Betty that her mother was not going to be there because someone was coming to pick her up and take her someplace. While the girls were at the store and while Bobby was cutting the grass, defendant shot and killed his wife. During the hour or so that all the children were at the Dairy Queen, defendant cleaned up the scene of the crime and burned whatever evidence was present. He was seen burning this at the time by his neighbor. None of the children saw Kim when they returned home. Betty attempted to see if her mother had left any of her things and sought to enter the bathroom in the master bedroom. Defendant was standing in front of her and she was prevented from doing so. The state contends that the bathroom contained the body of Kim Blair at that time. Later during the night Betty saw defendant carrying what she thought was the body of her mother outside. Obviously at that time Kim Blair was buried and later within the next day or two the concrete slab was poured over the site.
*1108 Defendant said that the death of Kim was the result of a violent struggle in which the weapon discharged as the result of the struggle. Defendant says he panicked, buried the body immediately after the killing. The postmortem examination led the doctor to conclude that when last alive, Kim Blair was very emaciated. He estimated her weight at 80 pounds, her height at 4 feet 10 inches. This testimony is consistent with Suzie Shepherd's statement that Kim was sick and weak. The version of the defendant was simply unbelievable and was properly and totally rejected by the jury. There was sufficient evidence to sustain the verdict in the first degree.
Due to a possible conflict of interest, the public defender could not represent the defendant, so a private attorney was appointed by the court. Defendant attacks the constitutionality of section 925.036, Florida Statutes, which limits attorney's fees in a capital case to $2,500.
The motion filed in the trial court did not state that the attorney was unable to adequately prepare a defense. Nor has it been shown that the maximum fee limitation of the statute in some way deprived defendant of a vital aspect of his defense or in some other way work to his detriment.
The real complaint concerning the statute was nothing more than that the attorney did not receive enough money. This is an insufficient basis upon which to ground a motion attacking the constitutionality of the statute.
In the court findings of fact in support of the death penalty, the following findings were made as to aggravating circumstances:
1. That the Defendant, RICHARD CECIL BLAIR, murdered Kim Blair from a premeditated design.
2. That the Defendant, RICHARD CECIL BLAIR, knowingly created a great risk of death to many persons.
3. That the capital felony was committed for the purpose of avoiding or preventing a lawful arrest, or in the alternative, to disrupt or hinder the enforcement of law in concealing and preventing the reporting to governmental agencies, the offense of Sexual Battery upon a minor female child, by the killing of Kim Blair.
4. That even though the death of Kim Blair may have been instantaneous, by one grazing wound to the skull and two direct bullet wounds to the brain, said capital offense was heinous as being extremely wicked or shockingly evil and atrocious and vile in the manner in which the defendant disposed of the victim by the burying of her remains in the rear yard of their home and pouring a concrete slab over the burial site.
The above were weighed against the sole circumstance of mitigation, i.e., that defendant had no significant history of prior criminal activity.
Defendant first contends that the trial judge should not, and could not, have found the existence of the first aggravating circumstance since the notion of premeditation was not added to the statute until after the crime was committed. Subsection (i) of section 921.141(5) was not added to the statute until July 3, 1979. The trial judge did not utilize the language of the added factor, the jury was not instructed about the additional factor, and the factor was not argued to the jury by the prosecutor. We are of the opinion that finding number one was not intended to represent the aggravating factor found in the amended version of the statute. Therefore, we view the finding as "non-statutory" and it should not be considered in aggravation under the circumstances of this case.
The trial court also improperly found that the defendant "created a great risk of death to many persons". This aggravating factor is not present unless a great risk of death is created to many persons, not one or two. Brown v. State, 381 So.2d 690 (Fla. 1980); Kampff v. State, 371 So.2d 1007 (Fla. 1979).
In considering the fourth aggravating circumstance the trial judge obviously considered the manner in which defendant *1109 disposed of the victim by burying her remains in the rear yard of their home and pouring a concrete slab over the burial site. In Halliwell v. State, 323 So.2d 557 (Fla. 1975), the defendant dismembered the body of the victim several hours after the homicide. We pointed out that once the victim dies, the crime of murder was completed and the mutilation of the body many hours later was not primarily the kind of misconduct contemplated by the legislature in providing for the consideration of aggravating circumstances. It was improper for the trial court in the case sub judice to consider this circumstance in determining whether or not the aggravating factor was shown by the evidence.
Because of the existence of a mitigating factor, and the improper inclusion of several aggravating factors, we must vacate the death sentence. Furthermore, comparing this case with others, we remand it for imposition of a life sentence. Cf. Halliwell v. State.
We have carefully reviewed the record in this case and find no reason to reverse the judgment of conviction, so the judgment is affirmed. The death sentence is vacated and the cause is remanded to the trial court for the imposition of a life sentence without eligibility for parole for twenty-five years.
It is so ordered.
SUNDBERG, C.J., and BOYD, OVERTON, ALDERMAN and McDONALD, JJ., concur.